## ASSUMPTION OF CONTROL OF CORPORATIONS BY COURTS.

Common Pleas Court of Hamilton County.

LOUIS DE LACROIX ET AL v. THE L. EID CONCRETE STEEL COMPANY ET AL.

Decided, March, 1909.

*Corporation—Injunction against Directors or Managers—Discretion of Directors as to Declaration of Dividend—Taking Corporation out of the Control of Its Directors—Receiverships for Insolvent Corporations—Practice of Warding off Creditors by Receivership Reprehensible—Trust Will not be Declared in Property, Unless—Purchase by a Corporation of Its Own Shares—General Powers of Corporations.*

1. An injunction will not be granted by a court of equity, on the application of stockholders of a corporation, to restrain or interfere plication of stockholders of a corporation, to restrain or interfere affairs of the corporation, when they are not exceeding their legal powers and are acting within the scope of their authority, in the absence of a showing of fraud or breach of trust.

2. A court of equity has no power to direct or compel the directors of an Ohio corporation to declare a dividend out of any other fund than the surplus profits as defined by the statutes of Ohio; and in the absence of bad faith or an arbitrary and unjustifiable withholding of the profits of a corporation by its board of directors, the discretion, vested in the directors to declare a divdend will not be interfered with or controlled by the courts.

3. In the absence of statutory authority, a court of equity has no power at suit of stockholders to take any steps for the sole purpose of winding up the affairs of the corporation, or in ordinary cases take the control and management thereof out of the hands of the directors even on the ground of mismanagement and fraud.

4. Even in cases of insolvency it is doubtful whether or not a court of equity, under the Ohio statutes has the power and authority to appoint a receiver to take charge and possession of the property of the corporation and conduct its business except in very rare cases where it is necessary to preserve the property of the corporation pending the determination of some other legal rights of the corporation, its stockholders or creditors, or in cases where the court has dissolved the corporation under Sections 5651 and 5688 inclusive of the Revised Statutes of Ohio, and the receiver is then

490    HAMILTON COUNTY COMMON PLEAS.

De La Croix et al v. Eid Concrete Steel Co. [Vol. VIII, N. S.

appointed for the sole purpose of administering the property of the deceased corporation under the direction of the court.

5. The practice of appointing receivers even of insolvent corporations in the absence of foreclosure proceedings or judgment levies on its property, but solely for the purpose of warding off its creditors and preventing or delaying creditors and others in the assertion of their legal demands is reprehensible and unauthorized.

6. A trust in either real estate or personal property will not be declared unless the evidence showing the establishment, or declaration thereof, is clear, convincing and conclusive, and that there are sufficient words to create it, a definite subject upon which the trust may be engrafted, a certain or ascertained object, and the terms of the trust are sifficiently declared to enable the court to pronounce judgment without resorting to extraneous evidence to determine every element of the trust.

7. In the absence of statutory authority corporations organized under the laws of Ohio have no power or right to traffic in or purchase their own shares except for the purpose of saving themselves from loss.

8. Corporations being artificial creatures of the state's creation, have such powers and only such as are expressly granted by law or which are *necessarily* implied to enable them to carry into effect the powers expressly granted, and this rule applies with equal force to private corporations as well as to public corporations.

*Healy, Ferris & McAvoy,* for plaintiffs.

*Rufus B. Smith, Adolph Richter* and *Charles A. Groom,* contra.

GORMAN, J.

This action is brought by the minnority stockholders of the defendant company against the company and the owners of the majority of the stock. In substance, the plaintiffs allege that the defendant company was incorporated under the laws of Ohio, in January, 1904, for the purpose of engaging in the business of constructing buildings and other structures of reinforced concrete, with an authorized capital stock of $10,000, of which stock 157 shares of the par value of $7,850 have been issued, each share being of the par value of $50; and on the books of the company said issued stock is held as follows: Ludwig Eid, 81 shares; G. R. Stattlemann, 40 shares; Henry Schick, 2 shares; Louis De Lacroix, 20 shares; George De Lacroix, 10 shares; Theodore Kraemer, 4 shares; and that said issued stock is fully paid for.

Plaintiffs further allege that in the month of March, 1905, the defendant corporation, with the consent of all its stockholders, purchased the forty (40) shares of stock then held by George Stattlemann upon the understanding and agreement that said stock should be retired and canceled: that in making said purchase it was agreed that the certificate held by said Stattlemann should be assigned by him to the defendant, Ludwig Eid, but said stock was in fact paid for out of the funds of said company, and that said Eid now claims to be the owner thereof.

Plaintiffs further set out that the directors elected after the incorporation of the company were five, of whom Louis and George De Lacroix, Ludwig Eid and Stattlemann were four, and Joseph De Lacroix the fifth; that Eid was elected president and treasurer; Louis De Lacroix, vice-president, and Henry Schick, secretary, and that the same board of directors and officers were re-elected in February, 1905; and in 1906 the same directors were elected except Stattlemannn, in whose place Henry Schick was elected, and the officers were the same as the previous years and Louis De Lacroix was appointed general superintendent of construction.

Plaintiffs further say that no directors have been elected since February, 1906; that since the organization of the company there has been on hand a large surplus out of which dividends could have been paid to the stockholders, but in fact no dividends have ever been paid; that the company has now on hand $150,000 over and above its capital stock issued, and that of said sum the greater part thereof is available for the payments of dividends.

Plaintiffs further aver that after the election in February, 1906, said Eid took possession of the moneys, property, assets and business of the company and still retains possession thereof, and is managing and controlling the business of said company and has excluded the plaintiffs and the board of directors therefrom; that he has taken large contracts in the name of the company for the construction of buildings without the authority of the directors and without consulting them; that he has refused to allow any dividends to be paid to plaintiffs on their stock; that since November, 1906, there have been but four di-

492     HAMILTON COUNTY COMMON PLEAS.

De La Croix et al v. Eid Concrete Steel Co. [Vol. VIII, N. S.

rectors. because Joseph De Lacroix then transferred his stock to plaintiff, Kraemer, thereby causing a vacancy in the board of directors which has not since been filled; that defendant, Schick, is entirely controlled by Eid, and the minutes of the company are dictated by Eid and written down by Schick as directed by Eid; that said Eid has recently entered into large contracts, one in Indianapolis for $80,000, one with the city of Cincinnati for $145,000, and one with the city of Newport, Kentucky, for $25,000, and numerous other contracts, all without the consent or authority of the board of directors of the company; and that said Eid threatens to continue to carry on the business of the company without the sanction of the board of directors, and to take large contracts in its name without the consent or approval of the board of directors, and that he is now holding its property and moneys in his exclusive possession, and if permitted to continue to do so great loss and irreparable damage may be suffered by plaintiffs.

In conclusion the plaintiffs pray:

First. That Eid may be enjoined from entering into any further contracts in the name of the company without the approval of its board of directors.

Second. That said company and its directors may be compelled to declare and pay to the stockholders such dividends as may be just and proper.

Third. That a receiver be appointed to take charge of and manage and conduct the company's business and the company wound up, and its property and assets reduced to money, its debts paid and the balance distributed among its stockholders.

Fourth. That said Eid may be declared by the court to hold said forty shares of stock in trust for the company and that said shares may be canceled, and that plaintiffs may have such other and further relief as the equity of the case may require.

The L. Eid Concrete Steel Company and Ludwig Eid have filed a joint answer, and the defendant, Henry Schick, has filed a separate answer. Each answer denies any and all wrongdoing alleged to have been committed by either Eid or Schick and they deny each and every material allegation of the petition.

It is further alleged in the answer of the company and Eid, that on January 11, 1909, five directors were elected, to-wit: Ludwig Eid, Henry Schick, William Harig, Adolph Richter and Malcolm McAvoy; and that Eid was elected president and treasurer; Schick vice-president, and Richter secretary; that in February, 1906, the surplus of the company was $57,911.86, and in March, 1908, it was $100,000; that at the meeting of the directors of the company in January, 1909, a dividend of 100 per cent. was declared, amounting to $7,850, and that it would have been imprudent and inadvisable to have declared a larger dividend or to have previously declared any dividend for the reasons that the necessities of the business required the use of all its assets to meet the demands of a large growing business, and to be prepared to meet a large threatened claim against the company; that the directors and all officers in the matter of declaring a dividend and in all other matters, have acted in the utmost good faith and in the exercise of their discretion for the best interests of the company and all the stockholders; that in the matter of the contracts entered into and undertaken by Eid on behalf of the company, full authority was given under the rules and regulations of the company and by action of the board of directors; that wide powers were vested in Eid by the rules and regulations in respect to the making of contracts and that this was absolutely necessary to the successful prosecution of the business of the company, on account of his superior knowledge of the details of the work, which knowledge was not possessed by any other officer or director, Eid being a competent and highly educated and skilled engineer in the line of all concrete and ferro-concrete construction, the kind of construction for which the company was organized to engage in and carry on; that no objection to the exercise of said powers and authority by Eid was made by plaintiffs until the bringing of this action.

Eid denies that he ever in the past has acted or intends in the future to act either in respect to the making of contracts, or in any other matter, other than as he has been duly and lawfully authorized to do. Eid further alleges that on April 15, 1905, he purchased in good faith and for value with his own money the forty shares of stock owned by George Stattlemann, and

has ever since been and is now the owner thereof, said stock not having been transferred on the books of the company, awaiting the termination of this litigation.

Schick in his answer adopts the averments of the answer of the L. Eid Concrete Steel Company, and in addition thereto denies that his vote in the board of directors had been controlled by Eid; he denies that he prevented the selection of a successor to fill a vacancy in the board of directors of the company; he denies that Eid has controlled him as secretary of the company or dictated to him as secretary the minutes to be entered of the meetings of the board of directors; he denies that Eid has prevented him from making an accurate record of the proceedings of said board of directors.

It will therefore be seen that on all the material averments of the petition there is an issue raised by the answers. I shall take up and dispose of the four legal propositions involved in the case as indicated by the prayer for the relief asked.

First. On the pleadings and the evidence, shall Ludwig Eid be enjoined from entering into any further contracts in the name of the company without the approval of the board of directors?

By the provisions of the rules and regulations of the company, Eid, the president, is made the general manager of the business, and a board of five directors is provided to control the affairs of the company. Eid is a member of the board of directors, at present the other four being, Henry Schick, William Harig, Malcolm McAvoy and Adolph Richter.

Whatever might have been the disposition or inclination of the former boards of directors, it is not claimed that a majority of the above named directors are disposed or inclined to act otherwise than for the best interests of the company, and in the absence of a showing that the present board of directors will not do their full duty, it would appear to the court to be a piece of impertinence and presumption on the part of this court to undertake to supplant the duly and legally constituted body in whom the law vests the powers of directing and controlling the affairs of the corporation. If Mr. Eid is exceeding the authority delegated to him by the law, the rules and regulations of

the company, and the resolutions and actions of the board of directors, it is a very easy matter for the directors to curb his authority and repudiate any unauthorized act of his.

Furthermore, on January 8, 1906, by unanimous vote of the directors, including the votes of plaintiffs, the following resolution was adopted:

"On motion Mr. L. Eid was authorized to administer the whole business, deeming it for the best interests of the company, seeing fit."

The evidence discloses that Eid is the only one connected with the company who is capable of making an intelligent estimate of the cost of a structure such as the company is engaged in erecting; that he and he alone is capable of making an intelligent and safe bid for work, and that he and he alone is qualified among all the stockholders and directors of passing judgment on the question of whether or not the work is properly done. He is the owner of more than one-half of the capital stock, aside from the forty shares in dispute, and is therefore more vitally interested in the financial success of the company than all the other stockholders combined. His management and conduct of the company's business during a period of about four and one-half years of its existence, has shown itself to be phenominal. From a small venture in which the combined holdings were $7,850 in cash paid into the treasury in February, 1904, the net value of the assets of the company at the beginning of the present year was over $100,000, according to the admission of Mr. Eid and the company, but according to the claim of the plaintiffs, the net value of the assets is nearer $150,000, and the greater part of this wonderful success has been brought about by the knowledge, skill and direction of Mr. Eid. Surely the plaintiffs can not seriously desire the court to enjoin Mr. Eid in doing what he has been authorized by the directors to do, and that in face of the fact that no objection was ever made by any stockholder or director, inside or outside of any directors or stockholders meeting to the course pursued by Mr. Eid as president and general manager. The court is of the opinion that there is no warrant or precedent for an injunction in this case,

496    HAMILTON COUNTY COMMON PLEAS.

De La Croix et al v. Eid Concrete Steel Co. [Vol. VIII, N. S.

and that no authority can be cited in support of the contention of plaintiffs. To the mind of the court, an injunction in this case would be fraught with the same disasterous results as followed the action of the avaricious man mentioned in that ancient classic, ''Mother Goose's Melodies,'' who became impatient because the goose laid but one golden egg each day and therefore killed the goose.

An injunction will not be granted on the application of stockholders, to interfere with the board of directors of a corporation, or its management of the affairs and business of the company, when they or the manager are acting within the scope of their authority, in the absence of a showing of fraud or breach of trust. *Sims* v. *Street R. R. Co.*, 37 O. S., 556; *Rehn* v. *North Fairmount B. & S. Co.*, 6 N. P., 185; *Duckworth* v. *C., H. & D. R. R. Co.*, 2 C. C., 518; *Goebel* v. *Herancourt Brewing Co.*, 7 N. P., 230; *Baldwin* v. *Hillborough R. R. Co.*, 10 W. L. J., 337; *Walker* v. *Mad River & Erie R. R. Co.*, 8 Ohio, 36-39.

Secondly. ''Shall the defendant company and its directors be compelled to declare and pay to the stockholders such dividends as may be just and proper?''

The matter of the payment of dividends rests in the sound discretion of the board of directors; and the only restriction imposed upon the directors under the Ohio statutes are found in Sections 3269-1-2-3-4, Revised Statutes, which in substance provide that dividends shall be declared and paid by the directors out of the surplus profits, defining what are surplus profits, and prescribing penalties for the payment of dividends out of any other funds or resources except such surplus profits as are therein defined.

It is argued by counsel for plaintiffs that a court of equity has power to require the directors of a corporation in a proper case to declare a dividend, and it may be and is conceded that such power is lodged in the court, but the question of what is a proper case must and does rest in the sound discretion of the court. Each particular case must stand upon the facts disclosed by the evidence. In the case at bar, there never was any demand made upon the board of directors for a dividend before the

bringing of this action; there was no complaint made by any stockholder because of the failure to pay a dividend; and it can scarcely be claimed that a court of equity should order the board of directors to do an act which they might have willingly done, had they been requested to do so.

Furthermore, it appears from the evidence that the defendant company at times requires a large sum of money to meet its bills, and inasmuch as the original capital invested by the stockholders was comparatively small and the company has been in operation of its business but a short time, it would appear to be consistent with prudence and good business management for the directors to permit the surplus or profits to accumulate so that the company would not be under the necessity of borrowing money to carry on its business. The value of its real estate and machinery is not more than $25,000, and the credit of the company would be largely based upon the value of these assets, and not on the cash or outstanding claims due it. Surely the court can not say, as a matter of law, that the action of the board of directors under these circumstances, in failing to declare and pay a dividend, is an abuse of their discretion. The law gives the board of directors the discretion to declare a dividend, not the stockholders, not the court, and it would, indeed, be a bold and daring court that would supplant the board of directors, substitute its judgment for that of the directors, and assume the grave responsibility of declaring that a certain dividend should be paid to the stockholders, under the facts disclosed in this case. An examination of the authorities cited by counsel for plaintiffs on this point discloses the rule to be that the discretion vested in the board of directors to declare a dividend, will not be interfered with or controlled by the courts, in the absence of a showing of bad faith or an arbitrary and unjustifiable withholding of profits. *9 Am. & Eng. Ency. of Law,* 2d Ed., pp. 686-687; *Arbuckle* v. *Woolson Spice Co.,* 21 C. C., 357; *Cook on Corporations,* 2d Ed., Section 545, p. 1476, and cases there cited. See, also, Section 2128, *Thompson on Corporations,* Volume 2.

See, also, following authorities cited by counsel for defendants: *Elliott on Private Corporations,* Section 399; *2 Cook on Corporations,* Section 545 (5th Ed.); *Bartow* v. *Lumber Co.,* 62 S. E.,

Rep., 235; *Bryan* v. *Sturgis Nat'l Bank*, 90 S. W., 704; *Rillins* v. *Denver Club*, 96 Pacif. Rep., 188.

In view of the fact that the rules and regulations of the defendant company provide that the ''dividends shall be declared at the discretion of the board'' (of directors) the case at bar is stronger than most of those met with in the books. See *Reynolds* v. *Diamond Mills Paper Co.*, 69 N. J. Eq., 299.

But if any further reason were required why no dividend should be declared by this court in the case at bar, it is furnished in the fact that in January of this year, the board of directors met and declared a dividend of 100 per cent., although plaintiffs' representative voted in the board meeting against the declaration of the dividend, and this dividend has been paid to all the stockholders, although some of them have refused and neglected to cash their dividend checks. Such a dividend is rarely declared in any enterprise in less than five years from the organization of the company. The stockholders have now received more than an averaged annual dividend of twenty per cent. since the organization of the company, and the company's assets remaining, are worth probably $100,000. Most men would not only be satisfied with such a magnificent showing, but would be so delighted with the genius of the man, Eid, who has accomplished this that they would be willing to give him *carte blanche* to conduct the business to his own satisfaction, as the directors of this company apparently did, as shown by the minutes of the board of directors.

Whatever foundation plaintiffs might have had at the time of the filing of their petition in this case, for asking this court to declare a dividend or to order the directors to do so, has been utterly removed by the action of the directors in declaring this dividend of 100 per cent. in January of this year. And while it may be claimed that this action was taken to forestall this court in ordering the declaration of a dividend, the fact remains that there was no reason in law, equity, good morals, or good conscience, why the directors should not have acted in the matter of this dividend just as they have done. The ground of complaint as to the dividend does not now exist, and the court ought not to do or order to be done an act which the party against

whom the complaint is lodged has already done, even though it were done during the pendency of the suit. The fact that the dividend was declared after the suit was brought, should be considered only for the purpose of determining who should pay the costs or a portion thereof. As to the dividend, the plaintiffs have now secured what they are asking the court in their petition to give them, and a court of equity will not do a vain and useless thing by ordering that done which has already been done by the party complained of.

Third. Shall a receiver be appointed for the defendant company as prayed for in the petition?

This claim for the appointment of a receiver was not seriously argued to the court in the oral argument by counsel for plaintiffs, nor is there any argument put forward in their briefs in favor of their claim made in the petition that a receiver should be appointed. The court has received the impression from something said during the oral argument that this claim has been abandoned. But still if it be contended that this is a case calling for the exercise of the court's authority to appoint a receiver, it is well to consider the facts of the case in order to apply the law of Ohio touching the appointment of receivers for corporations.

The defendant company is not only solvent within the meaning of that term as defined by the courts of this state, but its assets are more than ten times the par value of its capital stock after the payment of all its liabilities. There is no authority lodged in the courts of this state to take the management and control of the corporate business out of the hands of the duly constituted board of directors and commit it to the agent of the court acting as a receiver, except, *perhaps,* in the case of insolvency as provided in Section 5587, Sub. 5, Revised Statutes, or where the jurisdiction is conferred under Sections 4947 to 5912 inclusive, where the property of the corporation is attached or seized on execution or other legal process and there is danger of its property being lost, or injured, or taken away; or in proceedings in aid of execution, or by married women in actions against their husbands for divorce and alimony under Section 5705, Revised Statutes; or in proceedings under Sections

5651 to 5688 inclusive, for dissolving a corporation and winding up its affairs by the board of directors or a certain number of its stockholders. .

The court doubts very much the authority or the propriety of courts of common pleas and other tribunals having concurrent jurisdiction with them, in making appointments of receivers, as has frequently been indulged in of late years on the application of the directors and officers of the corporation, even in cases of insolvency, and is inclined to the opinion that no authority or jurisdiction to make such appointments on the sole ground of insolvency exists. It is not the business or the duty of courts to carry on the corporate business of those companies which find themselves in financial straits and are being pressed by their creditors, or for some other reason are unable to meet their obligations. The doors of the bankruptcy court or the insolvency court are open for such corporations just as they are open to individuals and partnerships doing business in this state. No special privileges should be shown to corporations either by the executive or judicial departments of government other than has been conferred on them by the legislative branch of the government. It has become too common a practice for the officers and directors of failing or criminal corporations to scurry off to the courts and secure the appointment of a receiver on the *ex parte* statement of the directors, officers, or attorneys of the corporation, and thus place the delinquent or offending concern in hiding behind the "skirts of justice," so that its honest creditors or an outraged public that has been wronged and injured, can not invoke the remedies afforded by the law to secure justice, without first securing the consent of the court making the appointment of a receiver. Such practices have a tendency to bring the courts into ridicule and contempt with the plain people. On the authority of the following Ohio cases the court is of the opinion that the appointment of a receiver in this case must be denied. *Sloan* v. *R. R. Co.*, 31 O. S., p. 1; *Railway Co.* v. *Jewett*, 37 O. S., 649; *C., H. & S. Ry.* v. *Duckworth*, 2 C. C., 518; *North Fairmount B. & S. Co.* v. *Rehn*, 6 N. P., 185; *Herancourt Brewing Co.* v. *Goebel*, 7 N. P., 230; *Peter* v. *Farrell Machine Co.*, 53 O. S., 534-551; *Schone* v. *Consolidated B. & S. Co.*, 4 N. P., 216.

Fourth. Are the forty shares of stock of the company which were bought by Eid from Stattlemann held in trust for the company and should there be a decree entered herein ordering them canceled?

Upon this question counsel for plaintiffs and defendants have put forth, both in their oral arguments and in their briefs, most strenuous efforts and there does not appear to have been left any stone unturned by either in their efforts to sustain their respective contentions. The court has been very much assisted by the very able and masterly presentation of this point by the briefs, and if all the authorities cited are not noted or commented upon it is because the limits of this opinion will not permit the court to thus indulge itself.

The facts touching the transaction of this stock between Eid, Strattlemann and the plaintiffs, giving the evidence the aspect most favorable to the contention of plaintiffs are in substance as follows:

About the 2d of March, 1905, Eid discovered that Stattlemann, who had subscribed and paid for and then held in his own name these forty shares of stock, was not acting in harmony with him, or for the best interests of the company. Eid went to the home of Louis De LaCroix that evening and said to the DeLacroix brothers, Louis, Joseph and George, "Stattlemann must go;" and he requested Louis and Joseph De Lacroix to go down to the office that evening and copy a letter of Stattlemann's lying on his desk and which contained evidence of Stattlemann's duplicity, which the De Lacroix brothers both did. On the following morning, the three De Lacroix brothers met Eid at the company's office, and Eid repeated his statement that "Stattlemann must go, and if he demands payment for his stock, then the company will buy in his stock," and the three brothers assented to this, or made no objection thereto. On the following day, March 4, in the afternoon, Eid met Louis De Lacroix at the company's office and Eid told him that he had seen Stattlemann that morning, and that Adolph Richter, his attorney, had advised him to pay Stattlemann $2,000 for his stock; that Stattlemann had threatened to get a lawyer and have the company put into the hands of a receiver, and thereupon Louis

De Lacroix said they had better not have a law suit, but to make
the best settlement he could. When Eid met Stattlemann on
March 3 (or April 3) at the company's office he (Eid) had a
copy of the troublesome letter written by Stattlemann, and he
became excited and told Stattlemann he wanted his resignation
as a director and officer (this is Stattlemann's testimony), and
thereupon Stattlemann said, "Buy my stock and I will go out."
Thereupon the two began to negotiate for the sale of the stock
and finally Eid agreed to pay Stattlemann $2,750 for his forty
shares, and Eid was given a months time to c'ose the sale. The
name of the company was not mentioned in the whole transac-
tion, and Stattlemann supposed he was selling his stock to Eid.
At this time the company was indebted to Eid for money loaned
to it in the sum of about $3,400. On March 7, 1905, Eid had a
conversation with the three De Lacroix brothers after he had
agreed with Stattlemann, but before he had secured and paid
for the stock, in which Eid said, "Now I have settled with
Stattlemann for $2,750, what fund shall we transfer this to?
To which Louis De Lacroix said, "That is something I don't
know." Then Eid said he would see Richter about it. Eid
denies that any of these conversations took place except the one
at the house of Louis De Lacroix, which he says was on the second
of April, and not on the second of March. Nothing was said by
Eid to the De Lacroix brothers or anyone else about retiring
the stock of Stattlemann. About April 5, 1905, Eid went to the
German National Bank and borrowed $4,000 on the company's
note, deposited the proceeds of this note to the credit of the com-
pany's account and drew from the company's funds $2,750 on
account of what the company owed him, and this sum is charged
to Eid's individual account on the company's books as of that
day. On or about April 15, 1905, Eid drew his individual
check in favor of Stattlemann for $2,750, gave this check to
Stattlemann, and took the certificate of stock indorsed in blank
from Stattlemann, but never transferred the stock to himself
on the books of the company as he could easily have done, inas-
much as Schick, his friend, was secretary, and according to
plaintiffs' claim would do anything Eid said. He held the cer-
tificate in his own possession and there was no mention of the

transaction after that between the parties until the controversy arose about this action.

Upon this state of facts the court is asked to find that Eid is a trustee of this stock for the defendant company, and further asked to order this stock retired and canceled, so that plaintiffs and all the stockholders may receive the benefits of an increased value of their stock by reason of a diminution of the shares, the assets remaining the same.

The first inquiry is, what kind of a trust is to be declared, if these facts are sufficient in law to constitute Eid a trustee?

Trusts are divided with reference to their creation into express trusts, implied trusts, resulting trusts and constructive trusts. *Perry on Trusts*, Section 24; *Bispham's Equity*, Section 20.

An express trust must be created by some declaration of the party or parties, and it is generally created in writing, but it may be by parol.

Can this be an express trust, and if so, who created it? Certainly not Stattlemann. Did Eid either by writing or in parol create a trust in this stock?

There is no claim made that Eid after he acquired the stock declared either in writing or orally that he held this stock in trust for the company or any one else. In fact, there is no declaration of Eid's at all after he acquired the stock, with reference to it.

A person who is the owner of personal property or any chattel may create a trust in that property just as well as in real estate. When a person *sui juris* orally or in writing, explicitly or impliedly, declares that he holds personal property *in praesenti* for another, he thereby constitutes himself an express trustee. Under the decisions on this point a trust may be created by parol in any mere personal property, as in the shares of corporations, although the corporations themselves own real estate. *Perry on Trusts*, Section 86; *Tyler* v. *Tyler*, 25 Brad. (Ill.), 339; *Porter* v. *Bank of Rutland*, 19 Vt., 410; *Forster* v. *Hale*, 3 Ves. Jr., 696.

Even if the language attributed to Eid at the time he came to an agreement with Stattlemann, when he reported to the De Lacroix brothers on March 3 or 4, or on March 7, had been ut-

504    HAMILTON COUNTY COMMON PLEAS.

De La Croix et al v. Eid Concrete Steel Co. [Vol. VIII, N. S.

tered by him after April 15, 1905, when he had purchased and held the stock, nevertheless these words are not sufficient to create a trust. Loose, vague and indefinite expressions are not sufficient to create a trust. A mere declaration of a purpose to create a trust is of no value unless carried into effect. *Perry on Trusts,* Section 86; *Bailey* v. *Irwin,* 72 Ala., 505.

In order to create an express trust, Bispham says, Section 65, that three things must concur, ''Sufficient words to create it, a definite subject, and a certain or ascertained object,'' and he adds, ''To these requisites must be added another, viz.: that the terms of the trust shall be sufficiently declared.''

In the case of *Hays* v. *Quay,* 18 P. F. Smith, 263, it was held that where a party *at the time he purchased* a certain tract of land executed an instrument by which it was set forth that the purchase was *intended for another,* the mere fact that the purchaser intended to give the property to the alleged beneficiary, could not have the effect of raising a trust. The declaration of trust must be contemporaneous, or at least, in contemplation at the time the title to the property is vested in the trustee, and if an absolute conveyance is made, no subsequent declaration can deprive the grantee of his beneficial interest. *Bispham's Equity,* Section 65; *Perry on Trusts,* Section 77.

In order to establish a trust in this state, the evidence must be clear, convincing and conclusive (*Mannix* v. *Purcell,* 46 O. S., 102; *Vance* v. *Park,* 15 C. C., 713). And this rule applies to personal property as well as to real estate and to all kinds of trusts. *Perry on Trusts,* Section 77; Section 86 on p. 87; *Bailey* v. *Irwin,* 72 Ala., 505; *Pomeroy's Eq. Jurisprudence* (3d Ed.), 1038-1040; *Vance* v. *Park,* 15 C. C., 713; *Fleming* v. *Donohue,* 5 Ohio, 256.

It will not of course be claimed that the facts in the case at bar establish a case of a constructive trust. There is no element of fraud, or of a fiduciary who has gained some advantage for himself out of trust property. Eid was not a trustee of this stock before the purchase thereof, at least. He was a trustee or director of the company. *Perry on Trusts,* Section 166.

If there is any evidence in this case tending to establish or raise a trust, it must be a resulting trust. Is this case a resulting trust?

While counsel for plaintiffs do not state this in so many words, the arguments advanced to support their contention are all along the line of claims usually made in support of resulting trusts.

Now a resulting trust may arise in several ways, but the one way most usual is in a case where a purchase is made and the money paid by one man, and the title to the property taken in the name of another. Here the law implies a trust on the part of the latter to hold the legal title for the benefit of the actual purchaser. If there is a resulting trust in the case at bar it must be of the kind just mentioned, because no other kind of resulting trust can be found to come at all near squaring with the facts adduced from the evidence before the court.

Counsel for plaintiffs assumes that the agreement between Eid and the De Lacroix brothers has been established, whereby Eid agreed to purchase these forty shares of stock from Stattlemann for the company, and then proceeds to show by authorities that the purchase by a company of its own stock is perfectly lawful now in Ohio, since the double liability provisions of the Constitution and the laws have been abolished.

It is urged that even before the double liability provisions were abrogated, it was lawful for a corporation under some circumstances to buy its own stock. This proposition is true, but the right to buy its own stock existed only in such cases as those in which the corporation had a lien on its own stock in equity and found it necessary to buy in the stock to protect itself from loss (*Columbus, etc., Ry. Co.* v. *Burke,* 19 W. L. B., 27), or where the corporation has exchanged stock for property it may re-exchange to settle a dispute as to the value of the property (*Sanderson* v. *Aetna Iron Co.,* 34 O. S., 442; *Morgan* v. *Lewis,* 46 O. S., 1; *Biggio* v. *Sandheger,* 8 N. P., 13-15); or a corporation might buy or take its own stock to secure itself from loss on a pre-existing debt. *Taylor* v. *Miami Exporting Co.,* 6 Ohio, 176; *State* v. *Franklin Bank,* 10 Ohio, 91-97.

In the last case cited the Supreme Court on pages 97 and 98 uses this language:

"So bank shares may by an individual stockholder be transferred to the bank in payment of a debt, and when so trans-

506     HAMILTON COUNTY COMMON PLEAS.

De La Croix et al v. Eid Concrete Steel Co. [Vol. VIII, N. S.

ferred become the property of the corporation, and it is believed that this is the only legitimate way in which a banking corporation can, as a corporation, become interested in its own stock. And even the propriety of this mode of acquiring property in stock, has been seriously questioned.''

Or the company may expend money to take up or regain stock which has been fraudulently issued, where there is reason to apprehend that otherwise great loss may result to it. *C., H. & D. R. R. Co.* v. *Duckworth*, 2 C. C., 518.

Or as a part of a contract of a sale of its shares, a corporation may buy back the same stock at stated times, there being no intervening rights of creditors. *Zerke* v. *Price*, 5 N. P., 580.

But the general rule has been that a corporation is forbidden by law on the grounds of public policy, from trafficking in its own stock. *Holcomb* v. *Gibson*, 39 W. L. B., 380; *Hubbard* v. *Riley*, 3 W. L. B., 434; *Shaw* v. *Ohio Installation Co.*, 19 W. L. B., 292; *Coppin* v. *Greenlees*, 38 O. S., 275; *Benedict* v. *Market Nat'l Bank*, 4 N. P., 231; *Willis* v. *Reed*, 5 W. L. B., 79; *Merchants Nat'l Bank* v. *Overman*, 17 C. C., 253; *State* v. *Oberlin, etc., Loan Ass'n*, 35 O. S., 258; *Cleveland, etc., R. R. Co.* v. *Kelley*, 5 O. S., 180; *State* v. *Franklin Bank*, 10 Ohio, 91-98.

It seems to the court that the case of *Merchants National Bank* v. *Overman Carriage Company*, 17 C. C., 253, being a decision of our own circuit court, is conclusive and binding on this court on the question of the right of the corporation to buy in its own stock for the purpose of getting rid of or retiring one or more of its officers and directors. It was there squarely held that this could not be legally done. Judge Swing, in deciding the case, uses this very pertinent language:

''The resolution under which this purchase was made recited that it was for the purpose of retiring Fallon as vice-president and Junghaus as secretary of the company. This is no valid reason for the company buying in its own stock. It may or may not have been for the interest of the company for these parties to retire from their offices, but it is not sufficient in law for the company to become a purchaser of its stock. The necessity for avoiding loss to the company did not exist.''

There is a section of the statute (3266) which forbids any corporation from employing its stock, means, assets or other

property directly or indirectly for any other purpose whatever, than to accomplish the legitimate objects of its creation. Surely the employment of the funds of the defendant company in the purchase of the stock of one of its officers for no other purpose than to retire him from the company, is not employing its means or property to accomplish the objects of its creation. See *Railway Co.* v. *Iron Co.*, 46 O. S., 44-50.

There is no statute in Ohio authorizing a corporation to traffic in its own stock or to purchase the same; and the general rule is that unless the governing statute or constitution of a company authorizes it in express terms to purchase its own shares, such purchase is *ultra vires*. *Thompson on Corporations*, Volume 2; Section 2054; *Id.*, Volume 3, Section 3276. See numerous cases cited under above sections.

It is no answer to the doctrine laid down in the authorities cited to say, as counsel for plaintiffs do in their brief, that the reason for the rule was to protect the rights of creditors in the enforcement of the double liability provisions, and that inasmuch as no double liability now exists in Ohio, therefore the rule no longer exists, as the reason therefor has disappeared.

There is another reason for the rule than the one mentioned by counsel for plaintiffs, and perhaps two reasons why it should still be in force and recognized, notwithstanding the "passing" of the double liability rule.

A corporation being an artificial creature of the state, has such powers and only such as are expressly delegated to it or which are necessarily implied to enable it to carry into effect the grant of its express powers. *Bonham* v. *Taylor*, 10 Ohio, 108; *Franklin Bank* v. *Commercial Bank*, 36 O. S., 350; *Fuel Co.* v. *Capital, etc., Dairy Co.*, 60 O. S., 96-104.

This being true, how can it be contended that it is an implied power of a corporation to traffic in its own stock?

Is it necessary to do this in order to enable the corporation to carry into effect any of its express grants of power? Surely not.

Again, the effect of declaring Eid to be a trustee for this stock and ordering it canceled, would be the equivalent of ordering a decrease of the capital stock to the extent of these forty shares. The statute points out the method to be pursued to reduce the

capital stock of a corporation. Section 3264 provides that this may be done on the written consent of the persons in whose. names a majority of the stock stands on the books of the company. I am of the opinion that this method of reducing the capital stock is exclusive, and that the corporation has not the power to buy in its capital stock outstanding, for the. purpose of retiring it, and thereby reduce the capital stock of the company.

· Counsel for plaintiffs assumes that corporations, like natural persons, can do any act that a natural person can do unless prohibited by statute, and in support of this proposition they cite numerous authorities to show that acts of corporations apparently not authorized, have been upheld by the courts. It may be true that in an executed transaction on the part of corporate officers, the act has been upheld when no third person's rights have been affected, but it is quite a different question to direct a corporation to do that which is *ultra vires,* not for the purpose of saving it from loss, but to enable it to do indirectly what it could not do directly except under certain conditions, reduce its capital stock. This court does not believe that any well considered case can be found in the books, which holds· squarely that corporations may, like natural persons, do any act not prohibited, provided all its stockholders concur in the doing thereof; and regardless of whether or not it is within its express grant of powers, or those necessarily implied. The distinction between natural and artificial persons in the eyes of the law would be wiped out if this doctrine were to prevail.

In conclusion, I am of the opinion that the evidence does not disclose that Mr. Eid holds these forty shares of stock in trust for the defendant company or any other person, but that he bought the stock for himself, with his own money, and that no express trust was ever declared by him in this stock; nor is there either a resulting trust or constructive trust raised by reason of his conduct; and even if the court should be of the opinion that the facts under ordinary circumstances would raise a trust if the transaction had been between individuals or natural persons, nevertheless, there being no authority or power in. the defendant company to purchase its own· stock under the circum-

stances of this case, the court would not hold the stock to be in trust for the use and benefit of the defendant corporation.

Having found on all the issues joined in favor of the defendants, the plaintiffs' petition will be dismissed at their costs.